UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 4:14CR393 ERW/DDN |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN PALUCH, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT BRIAN PALUCH'S TIRAL BRIEF

### BACKGROUND

From December 31, 2006 through February 12, 2014, Brain Paluch was the Chief Financial Officer (the "CFO") of PARIC Corporation. He was also an Executive Vice President. PARIC Corporation is a multi-million dollar construction company. In his role of CFO, he was responsible for corporate functions including legal, accounting, treasury, marketing, safety and human resources. Unlike the typical CFO and Executive Vice President of this a company of this magnitude, Paluch also was tasked with handling minutia down to the level of, for example, purchasing golf balls as client gifts and scratch-off lottery tickets as employee incentives.

At its core, this case is about whether Paluch should be convicted of federal mail fraud because, while being pressed by the extensive duties of a CFO of a multi-million dollar enterprise, he made errors in accounting for minutia.

The government's trial brief suggests that PARIC and Paluch had a falling out because the Company's president, Joe McKee, promoted another vice president, rather than Paluch, to the

1

role of president.[1]  Doc. 69, p. 1.  While Paluch fell out with McKee, it grew out of circumstances far more serious than a personnel decision.  In July 2013, Paluch confronted McKee regarding PARIC's diversion, at McKee's instruction, of approximately six million dollars of otherwise taxable revenue to McKee family-related businesses and/or for the direct benefit of family members.  Rather than even considering – as Paluch urged – taking steps to remedy this tax fraud, McKee's response was to retaliate against Paluch and seek to discredit him.

To that end, PARIC commenced an "audit" with the predetermined goal of contriving accusations that Paluch had defrauded PARIC.  As expected, the audit came to such conclusions.  PARIC submitted these false and shoddy accusations to the Postal Inspector and the Federal Bureau of Investigation, which readily accepted them and took them to the United States Attorney.  Based upon this untruthful investigation and a misunderstanding of PARIC's records, the government charged Paluch with mail fraud.

The government seeks to convict Paluch on three counts.  The first focusses on Paluch's alleged use of $5,000 of PARIC funds as an incentive payment to McCarthy, Leonard & Kaemmerer ("MLK"), a St. Louis law firm, in exchange for hiring Paluch's niece as a summer associate. Indictment, ¶¶ 8-9.  The second and third allege that Paluch used a Company American Express ("AMEX") card for personal expenses.  *Id.* at ¶¶ 4, 10-11.  Paluch is guilty of none.

---

[1] Ironically, although the government intends to use evidence of the reasons why Paluch and McKee's relationship deteriorated, in its Motion in Limine it strenuously objects to Paluch telling his side of the story.  Doc. 72.

# COUNT I

Count I charges that on or about July 22, 2011, Paluch caused the mail to deliver a legal bill from MLK to PARIC in the amount of $5,000 for an "Agreed Upon Bonus." The government contends that this payment was an "incentive" to MLK to hire Paluch's niece, Christa Dittert. It was nothing of the sort. Ms. Dittert, at the time a Notre Dame law student, worked as a summer associate at MLK. The $5,000 amount that Paluch agreed to pay MLK was actually a *limit* on the amount MLK would bill PARIC for Ms. Dittert's work. Ms. Dittert worked on PARIC matters, as well as those of other clients, and billed her time accordingly. Rather than charging her time against this $5,000 that PARIC had paid, MLK decided, on its own accord, to bill Ms. Dittert's work through its normal process and retain the entire $5,000. As a result, Paluch was duped through this arrangement because he paid $5,000 for work that was not performed, while being billed separately for work that was.

In its Trial Brief, the government indicates that it intends to off "emails authored by defendant to Matt Menghini . . . and Menghini's replies regarding defendant's request for the firm to hire his niece. Doc. 69, p. 7. The government then states that it may or may not have certain witnesses whose communications with the defendant are at issue testify at trial. *Id*. The government cannot adduce any evidence regarding Paluch's communications with Menghini, email or otherwise, without the presence of Menghini at trial. Menghini is <u>the only</u> witness that forms the basis for government's theory against Paluch in Count I of the Indictment. Further, the vast majority of the content from the Menghini emails that the government would attempt to use as "context" is derived from internal law firm emails that were neither authored by Paluch nor sent to Paluch. Any attempt to "backdoor" Menghini emails into evidence without his presence at trial will be met with objection from Defendant.

3

## COUNTS II AND III

Counts II and III charge that Paluch, on December 1, 2011 and December 1, 2013, caused American Express bills to be mailed to PARIC in Paluch's name that included personal charges.  The government claims that Paluch submitted false internal reports to secure payment for such expenses.  But the government's case rests upon the assumption that, because it cannot explain discrepancies between AMEX billing statements and internal company forms, such discrepancies *must* indicate that Paluch was stealing.  In truth, Paluch's AMEX card was used for approximately $400,000 per year in PARIC purchases.  Paluch almost never used the card from personal purposes and, when he did, he reimbursed the Company for any charges.

Thus, the government's case is based on a lack of understanding of PARIC's records and a disinterest in gaining such an understanding.  Based upon this, simple and innocent errors in classifying or coding into which "bucket" a given expense should be placed has become a federal mail fraud prosecution.  This is true even though, regardless of the bucket to which any expense was assigned, PARIC was only for legitimate business expenses.

Respectfully submitted,

COSGROVE LAW GROUP, LLC

          /s/ Luke A. Baumstark

David B. Cosgrove MO Bar # 40980
Daniel V. Conlisk MO Bar #
Luke A. Baumstark MO Bar #56344
7733 Forsyth Blvd.
St. Louis, Missouri 63105
Telephone: (314) 563-2490
Facsimile: (314) 968-7371
E-mail:dcosgrove@cosgrovelawllc.com
dconlisk@cosgrovelawllc.com
lbaumstark@cosgrovelawllc.com

***Attorneys for Defendant***

## **CERTIFICATE OF SERVICE**

       I hereby certify that on August 2, 2015, I electronically filed the foregoing with the Clerk of the United States District Court for the Eastern District of Missouri by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                             /s/ Luke A. Baumstark